# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA,                    CRIMINAL NUMBER:

         **v.**                    **18-cr-00723-RBK**

ALIA AL HUNAITY,                    TRIAL VOLUME 5

       **Defendant.**

Mitchell H. Cohen Building & U.S. Courthouse
4th & Cooper Streets
Camden, New Jersey  08101
May 3, 2019
Commencing at 9:00 a.m.

**B E F O R E:**                    THE HONORABLE ROBERT B. KUGLER,
                    UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S:**

    OFFICE OF THE UNITED STATES ATTORNEY
    BY:  ALYSON M. OSWALD, ASST. UNITED STATES ATTORNEY
        ANDREW SCOT MACURDY, ASST. UNITED STATES ATTORNEY
    401 MARKET STREET, 4TH FLOOR
    CAMDEN, NEW JERSEY  08101

    LAW OFFICES OF ROBERT D. KOVIC ESQUIRE
    1 BRIDGE PLAZA, SUITE 275
    FORT LEE, NEW JERSEY 07024
    FOR THE DEFENDANT

    GALANTUCCI & PATUTO
    BY: S. EMILE LISBOA IV, ESQUIRE
    55 STATE STREET
    HACKENSACK, NEW JERSEY  07601
    FOR THE DEFENDANT

**A L S O   P R E S E N T:**

    Alia Al Hunaity, Defendant
       Carl Nami, Official Court Reporter
        Carl_Nami@NJD.USCourts.Gov
          (609) 439-5420

  Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription.

1                                    **INDEX**

2     **WITNESS:**                                                    **PAGE:**

3

                  **MARY SAKUNTHALA THALAHITIYA VITHANALAGE**        646
4                 CONTINUED DIRECT EXAMINATION OF MARY BY            646
                  MR. MACURDY:
5                 CROSS EXAMINATION OF SAKUNTHALA                    664
                  THALAHITIYA VITHANALAGE BY MR. LISBOA:
6                 REDIRECT EXAMINATION OF SAKUNTHALA                 762
                  VITHANALAGE BY MR. MACURDY:
7                 RECROSS EXAMINATION OF SAKUNTHALA                  781
                  VITHANALAGE BY MR. LISBOA:
8                 **MELISSA MARTE**                                  786
                  DIRECT EXAMINATION OF MELISSA MARTE BY             787
9                 MS. OSWALD:
                  CROSS-EXAMINATION OF MELISSA MARTE BY              789
10                MR. LISBOA:
                  REDIRECT EXAMINATION OF JAMES                      799
11                ORZECHOWSKI BY MS. OSWALD:
                  **RONALD C. CONYERS**                              800
12                DIRECT EXAMINATION OF RONALD C. CONYERS            800
                  BY MR. MACURDY:
13                CROSS EXAMINATION OF AGENT CONYERS BY              835
                  MR. LISBOA:

14                              * * * * *

15

16    DEFENDANT EXHIBIT 302 WAS RECEIVED IN EVIDENCE              696
      DEFENDANT EXHIBIT 308 WAS RECEIVED IN EVIDENCE              697
17    DEFENDANT EXHIBIT 314 WAS RECEIVED IN EVIDENCE              698
      DEFENDANT EXHIBIT 317 WAS RECEIVED IN EVIDENCE              699
18    DEFENDANT EXHIBIT 320 WAS RECEIVED IN EVIDENCE              700
      DEFENDANT EXHIBIT 321 WAS RECEIVED IN EVIDENCE              703
19    DEFENDANT EXHIBIT 324 WAS RECEIVED IN EVIDENCE              705
      DEFENDANT EXHIBIT 326 WAS RECEIVED IN EVIDENCE              705
20    DEFENDANT EXHIBIT 329 WAS RECEIVED IN EVIDENCE              706
      DEFENDANT EXHIBIT 349 WAS RECEIVED IN EVIDENCE              707
21    DEFENDANT EXHIBIT 361 WAS RECEIVED IN EVIDENCE              708
      DEFENDANT EXHIBIT 303 WAS RECEIVED IN EVIDENCE              733
22    GOVERNMENT EXHIBIT 401 WAS RECEIVED IN EVIDENCE             835

23                              * * * * *

24

25

CONYERS - DIRECT - MACURDY

1   (**RONALD C. CONYERS**, affirmed as a witness, testified as

2   follows:)

3           THE COURT:  State your full name.

4           THE WITNESS:  Ronald C. Conyers.

03:12   5           THE COURT:  Spell your last name.

6           THE WITNESS:  C-O-N-Y-E-R-S.

7           THE COURT:  Be seated.  You know what you need to do,

8   Mr. Conyers, please.

9       You may proceed, Counsel.

03:13   10          MR. MACURDY:  Thank you, your Honor.

11  (DIRECT EXAMINATION OF RONALD C. CONYERS BY MR. MACURDY:)

12  Q.  Good afternoon, Agent Conyers.

13  A.  Good afternoon.

14  Q.  We heard that you work at the Department of Homeland

03:13   15  Security, is that right?

16  A.  That's correct.

17  Q.  And how long have you worked at Homeland Security?

18  A.  I've been a Special Agent with Homeland Security since

19  2002, so about 16-and-a-half years.

03:13   20  Q.  And what is your current job title at Homeland Security?

21  A.  I'm Special Agent.

22  Q.  In what unit?

23  A.  I work under the human trafficking and child exploitation

24  group.

03:13   25  Q.  And what types of crimes does your human trafficking and

CONYERS - DIRECT - MACURDY

1   child exploitation group work on?

2   A.   We work on human trafficking cases.  That's my

3   speciality.  We work human trafficking cases, child

4   exploitation case.  I specialize most in the human trafficking

03:13   5   cases in which we deal with victims that come to the United

6   States and are forced -- wait a minute.  Victims come to the

7   United States and are forced to work, and sex trafficking

8   cases, and basically forced to work for employers and not

9   getting paid.

03:14   10   Q.   So are there different times, different types of human

11   trafficking that you've come across during your 16-and-a-half

12   years?

13   A.   That's correct, yes.

14   Q.   So one type you mentioned was sex trafficking.

03:14   15   A.   Yes.

16   Q.   Have you worked on sex trafficking cases?

17        MR. LISBOA:  I object to relevance.

18        THE COURT:  Is there some relevance to this?  Why

19   don't we stick to human trafficking, unless there's some

03:14   20   relevance to this.

21        MR. MACURDY:  I just want him to explain his

22   background a little bit, your Honor.

23        THE COURT:  All right.  Well, he explained, he's

24   worked on sex trafficking cases and child exploitation cases,

03:14   25   so let's keep going.

CONYERS - DIRECT - MACURDY

BY MR. MACURDY:

Q.   And so is another type of human trafficking, labor, labor trafficking cases?

A.   That's correct, forced labor cases.

03:14

Q.   Have you worked on a number of forced labor and labor trafficking cases?

A.   I have.

Q.   And what role have you played in these investigations, Agent Conyers?

03:15

A.   I have been a case agent, I've also assisted other agents on their cases.

Q.   And what types of labor trafficking cases have you worked on?

A.   I worked specifically for myself when I was case agent on

03:15

a forced labor case in which individuals were brought into the United States, and I'm going to call them victims.  We had at least 24 victims in this case, they were brought to the United States and forced to work --

THE COURT:  Finish your answer.  Go a little slower,

03:15

please, Agent.

THE WITNESS:  At least 24 victims that worked in hair braiding salons throughout New Jersey without pay.

BY MR. MACURDY:

Q.   So that one --

03:15

THE COURT:  Wait a minute, wait a minute, wait a

CONYERS - DIRECT - MACURDY

1    minute.  You have an objection?

2        MR. LISBOA:  Relevancy, Judge.  He's not being

3    qualified as an expert, so with regard to his other cases, not

4    particularly relevant, if he's not being qualified as an

5    expert.

03:15

6        THE COURT:  Well, I think I'm going to overrule that,

7    I think the jury is entitled to know what his experience is.

8    Apparently, he's going to testify about this case and his work

9    in this case.

03:16

10   BY MR. MACURDY:

11   Q.  So, Agent Conyers, that's one example of a labor

12   trafficking case that you've worked on over the time -- during

13   your time at Homeland Security?

14   A.  Yes.

03:16

15   Q.  During your 16-and-a-half years, approximately how many

16   victims of human trafficking have you interviewed?

17   A.  I've interviewed, I would say, over 50.  For my

18   particular cases, I've certified at least 30 victims.

19   Q.  Now, is it important to build trust of the victims that

03:16

20   you interview?

21   A.  That's definitely part of the human element, when you're

22   talking to victims, trying to get stories out of the victims,

23   as far as them telling their stories about what happened to

24   them, you have to try to build that rapport and, you know,

03:16

25   trust is everything when it comes to that.

CONYERS - DIRECT - MACURDY

1  Q.  Would it be useful to threaten victims of human

2  trafficking in your investigation?

3  A.  No use at all, you can't go down that route.

4  Q.  Now, how do human trafficking investigations often begin

03:17    5  in your experience?

6  A.  Usually, cases begin with tips from the his tip line,

7  that's the, you know, the Homeland Security investigation tip

8  line.  It can come from complaints off the street, or it could

9  just come from just a random source that just walked in and

03:17    10  wanted to talk about something that's going on that they want

11  to report.

12  Q.  And what is it about the nature of a human trafficking

13  case that makes tips to the tip line so important?

14  A.  Well, tips, the nature of the -- of a human trafficking

03:17    15  tip, what's going to make it important is that it's going to

16  be, you know, something that you have to follow up on rather

17  quickly so that you can react, if need be.

18  Q.  Now, what do you have -- in your cases in the past, have

19  you received tips that began investigations?

03:17    20  A.  Yes.

21  Q.  And what do you do after you receive a tip to the tip

22  line?

23  A.  First thing that I do when I receive a tip from the tip

24  line is, you have to see if it's a person that's going to be

03:18    25  willing to talk, the person that left the tip, and then you

CONYERS - DIRECT - MACURDY

1    would go out and set up an appointment to meet with the person

2    and see if they can, you know, give you further information.

3    Q.    And have you investigated tips that didn't lead to

4    extended investigations?

03:18    5    A.    I have.

6    Q.    So let's talk about your involvement in this case, Agent

7    Conyers.  When did this case here, this investigation begin?

8    A.    August 24th, 2018, his tip line contacted a duty agent in

9    my office.

03:18    10    Q.    Okay.

11    A.    And it was a general tip regarding a Mohammad Al Hunaity.

12            MR. LISBOA:  Objection as to hearsay, Judge.

13            THE COURT:  Overruled.  Something offered for the

14    truth of the matter asserted.

03:18    15    A.    Okay.  So it was a tip that came into our office

16    regarding Mohammad al Hunaity, and the tip basically stated

17    that it was a lady by the name of Mary being held against her

18    will at 522 Teal Plaza in Secaucus New Jersey.

19    Q.    Did the tipster leave their name at that time?

03:19    20    A.    No.

21    Q.    Now, when you were you informed of this tip and when did

22    you become involved in the case?

23    A.    I was informed of the tip on August 26, 2018.

24    Q.    What was your next step after learning about the tip?

03:19    25    A.    My next step was I -- it was a telephone number

CONYERS - DIRECT - MACURDY

1    associated with the tip.  On August 27th I contacted the

2    number, spoke to the source who wanted to remain anonymous,

3    and I set up a time to go out and meet the source.

4    Q.   And did you, in fact, interview the source?

03:19    5    A.   I did, on August 27th, 2018.

6    Q.   Now, based on your interview of the source, what was your

7    next action in the case?

8    A.   Okay.  So once we went -- you know, I brought a partner

9    with me to go sit town and talk to the source about this.  The

03:19    10    source actually added more information because in the original

11    tip, it was very general.  It talked about only Mohammad al

12    Hunaity, but once we sat down on August 27 and actually sat

13    and talked to the source, the source also mentioned that

14    Mohammad had a sister named Alia al Hunaity and then they went

03:20    15    a little further into the tip --

16         MR. LISBOA:  Objection as to hearsay.

17         THE COURT:  Overruled.

18    A.   It went a little further into the tip and stated that the

19    lady, Mary, was from Sri Lanka and that she had been working

03:20    20    for the family, Mohammad's family in the past in Jordan and

21    then eventually came to the United States nine years ago and

22    was working without pay taking care of Alia's three children.

23    Q.   Now, based on that interview with the source, did you

24    consider it appropriate to continue your investigation into

03:20    25    this tip?

CONYERS - DIRECT - MACURDY

1  A.   I did.

2  Q.   And what was the next step in your investigation?

3  A.   So the next step was, you know, at the end of that

4  interview of the source, I actually asked the source, I said,

03:20   5  I want to know, was the victim in any imminent danger of being

6  harmed.  The source stated, no.  The source stated that, like

7  the source stated, this person was working for nine years

8  taking care of Alia al Hunaity's children since birth, stated

9  that the children at the time were ten years old and that the

03:21   10  victim that was actually working in the house was not in any

11  imminent danger.

12       So my next step bass, you know, I gave it a little bit

13  of time, about a week and then within a week I contacted the

14  source again to see if there was any additional information

03:21   15  that the source wanted to add, which they did add additional

16  information.

17       The next step from there was to go out and start

18  hitting the streets and start my investigation.

19  Q.   Okay.  So Agent Conyers, when you say begin your

03:21   20  investigation, what are the investigative steps that you

21  employed?

22  A.   We -- steps that we employed are we have record checks,

23  doing surveillance at the location that was given on the

24  complaint and checking other names that the source actually

03:21   25  gave us so that we could get further addresses.

CONYERS - DIRECT - MACURDY

1  Q.  When you say "surveillance" around what dates were you

2  doing surveillance at the location in Secaucus?

3  A.  My surveillance began on September 6th, 2018, and

4  continued up until the date that we actually arrested Alia al

03:22  5  Hunaity.

6  Q.  Describe the nature of your surveillance?  What were you

7  looking at; what locations?  What were you looking for?

8  A.  I would go by the 522 Teal Plaza address, you know,

9  random times it would be morning, night, weekends because I

03:22  10  was looking for anything that I could actually tie the people

11  from the complaint Mohammad al Hunaity and Alia al Hunaity to,

12  to that location.

13  Q.  Okay.  And were you able to determine -- identify -- the

14  identities of people living at that location?

03:22  15  A.  I was.

16  Q.  And what did you discover?

17  A.  It was a Sunday morning.  I actually saw a vehicle at the

18  house, ran the plate of the vehicle and the plate came back to

19  Alia al Qatarneh.  At that point I knew that it was a

03:23  20  legitimate address for Alia al Hunaity.

21        MR. MACURDY:  Ms. Reed, could you pull up 302.3 in

22  evidence.

23  BY MR. MACURDY:

24  Q.  302.3 in evidence.  Do you recognize that, Agent Conyers?

03:23  25  A.  I do.

CONYERS - DIRECT - MACURDY

1   Q.   And what is that?

2   A.   That is the vehicle that was registered to Alia al

3   Qatarneh.

4   Q.   Where did you see that vehicle?

03:23   5   A.   522 Teal Plaza.

6   Q.   All right.  So after you identified that vehicle and that

7   it was registered to Alia al Qatarneh, what was the next step

8   in the investigation?

9   A.   The next step, continue surveillances, because now the

03:23   10   next step, I wanted to see if I could actually see an

11   individual that the source stated lived at the house.  She

12   said it was a Sri Lankan female and the female would actually

13   take three children to school or basically take them to the

14   bus stop and pick the kids up from the bus stop on a daily

03:24   15   basis.  So I went back, you know, in the afternoon, different

16   times, just to see if I would ever see this female ever leave

17   the house.  Couple times I sat out there, never saw anybody

18   leave the house.

19        You know, it was one particular day which was on

03:24   20   September 10th, I was out there and I saw a female that

21   appeared to be Sri Lankan, leave the location, and within 20

22   minutes she was back at the location with three children.

23   Q.   Now, after identifying that female, at this point, did

24   you know what her name was?

03:24   25   A.   I just knew the name Mary.

*United States District Court*
*Camden, New Jersey*

CONYERS - DIRECT - MACURDY

1    Q.   Okay.  Were there any other leads that you were looking

2    into or individuals that you were surveilling at that time?

3    A.   Yes, I also did surveillance at the location located at

4    Palisades Park because the source that left the tip stated

03:24    5    that on the weekends or every other weekend, Mary would go

6    with the children to Palisades Park to the children's father's

7    house.

8        So I was able to obtain the name of the children's

9    father and realized that he lived in Palisades Park, New

03:25    10    Jersey and then I started doing surveillance on that location

11    also trying to just verify if the person lived at the house.

12    Q.   Okay.  Were you able to verify that?

13    A.   I was, yes.

14    Q.   Now, did you do any -- did you do 24-hour surveillance on

03:25    15    the Secaucus address?

16    A.   I did not.

17    Q.   Okay.  After -- on September 10th, you saw the female

18    individual leave the house and bring the kids back.  What was

19    the next step after that?

03:25    20    A.   Well, yes, it was easy to actually verify that because,

21    you know, when she brought the kids back, the kids actually

22    went upstairs before her and she went to the mailbox and

23    pulled some mail out.  So at that point, I saw the mailbox, it

24    said 522, so I knew that we definitely were looking at the

03:25    25    right address.  So the next steps after that were, I would

CONYERS - DIRECT - MACURDY

1    have to try to get out there another day to see if it was

2    possible to actually talk to this person so I can try to

3    corroborate some of the stuff that the source stated in the

4    complaint.

03:25    5    Q.   And did you, in fact, speak with the female living at 522

6    Teal Plaza?

7    A.   Yes, we went back and conducted a knock and talk on

8    Tuesday, September 11th.

9    Q.   Was that the next day?

03:26    10   A.   That was the next day after September 10th.  I brought a

11   female agent with me.

12   Q.   Why did you do that?

13   A.   I knew it was a female in the house and I just didn't

14   want to show up with just myself or another male agent, so I

03:26    15   thought, you know, since it was female, female might be a

16   little more comfortable, you know, seeing a female officer.

17   Q.   And did you and the female officer -- what was the name

18   of that officer?

19   A.   Shirley Vasquez.

03:26    20   Q.   Did you and Agent Vasquez knock on the door of 522 Teal

21   Plaza?

22   A.   Yes, we conducted a knock and talk and Mary actually

23   opened the door.

24   Q.   What time of day was that?

03:26    25   A.   It was around 2:30 in the afternoon.

CONYERS - DIRECT - MACURDY

1  Q.  And how did you make the decision to knock at 2:30 in the

2  afternoon?

3  A.  I knew that she would be home based on the day before

4  when we saw -- when I witnessed her leave the house to go meet

03:26  5  the children at the bus stop.

6  Q.  What do you consider a knock and talk, Agent Conyers, if

7  you could explain?

8  A.  The knock and talk is where you just, you know, you don't

9  have a warrant to actually go to the house, so we conduct it,

03:27  10  we just go knock on the door and see who opens the door and

11  any individuals in the house we just, you know, ask can you

12  come in and can you talk to them regarding just some issues

13  about, you know, regarding the case.

14  Q.  Now, did Mary grant you entrance into the house?

03:27  15  A.  She did.

16  Q.  What did you say to Mary?  What was the nature of your

17  interaction on September 11th during the knock and talk?

18  A.  Well, we identified ourself as special agents from

19  Homeland Security and we asked Mary did she have any

03:27  20  identification so that way we could kind of verify who she

21  was.

22       She stated that she had identification, so the female

23  Officer Shirley Vasquez escorted her up to pull her

24  identification and she brought down her Sri Lankan passport.

03:27  25  Q.  Now, how long was this interaction on September 11th?

─── CONYERS - DIRECT - MACURDY ───

1  A.  We spoke to Mary, I would say, approximately about 20

2  minutes.  She was concerned that --

3          MR. LISBOA:  Judge hearsay, Judge.

4          THE COURT:  He hasn't said any statement yet.

03:28   5  Continue.

6          THE WITNESS:  She's continued that, you know, the

7  kids were getting ready to get off the bus so she wanted to

8  really meet the kids because that was her job and we didn't,

9  you know, want to stall that situation, so we didn't decided

03:28  10  to end the interview and let her go and meet the kids and then

11  we talked to Mary a little more and just asked her if it was

12  possible for us to come back the next day so we could sit down

13  and talk a little longer.

14  Q.  Okay.  Did you, in fact, come back the next day?

03:28  15  A.  Yes, we did.

16  Q.  You and Agent Vasquez again?

17  A.  Agent Vasquez, yes.

18  Q.  Okay.  And so that would be September 12th?

19  A.  That would have been September 12th, yes, a Wednesday.

03:28  20  Q.  What time of day did you go on September 12th?

21  A.  I want to say it was in the morning.  So around

22  10 o'clock in the morning.

23  Q.  Okay.  And again, who was at the home?

24  A.  It was only Mary.

03:28  25  Q.  And did you speak with her that day on September 12?

CONYERS - DIRECT - MACURDY

1    A.    We did.

2    Q.    Was it a longer interview?

3    A.    It was a longer interview.  If I could just backtrack.

4    On September 11th when we went in the house, you know, because

03:29    5    part of the Complaint, when we spoke to the source, she stated

6    that it was a bed in the kitchen.  And on September 11th --

7    September 11th when we were at the house, that was something

8    that was very noticeable when we entered the house.  Because

9    you sort of enter into like the dining room area and you could

03:29    10    kind of see off into the kitchen and, you know, we witnessed a

11    bed in the kitchen.

12    Q.    Okay.  Now, based on that sort of visual observation

13    yourself, did you consider it appropriate to continue pursuing

14    the investigation?

03:29    15    A.    Yes.

16    Q.    So now you come back on September 12th with Agent

17    Vasquez.  Do you speak with Mary that day?

18    A.    We spoke with Mary a little bit more in depth.  You know,

19    we basically told Mary that we already knew a lot about her

03:29    20    and then just asked her was she, you know, would like to talk

21    to us and tell us any more information.  And for the most

22    part, Mary said no problem, she would definitely talk to us

23    and she corroborated a lot of the things that the source said

24    in the complaint.

03:30    25    Q.    Did she provide any other documentation at that time?

*815*

CONYERS - DIRECT - MACURDY

**1**  A.    At that time, she provided her passport again and she

**2**  provided a marriage certificate.

**3**  Q.    Now, was Mary taken from the home that day?

**4**  A.    She was not.

03:30  **5**  Q.    And why is that?

**6**  A.    Well, again, just as when we spoke to the source, we

**7**  actually spoke to Mary and we just wanted to just ask her was

**8**  she in any imminent danger.  Usually with cases like this, it

**9**  takes time to work things up.  If a person is in imminent

03:30  **10**  danger and something is going to happen to them, if they're

**11**  getting raped or there's a possibility that something may

**12**  happen as far as like get killed or something like that, we

**13**  would immediately take them out of the house.  But she said

**14**  she wasn't in any imminent danger.  She just was going on

03:30  **15**  business as unusual, taking care of the kids.

**16**       I told her we would be in touch.  We left our telephone

**17**  numbers for her to give us a call if there was ever a serious

**18**  problem, and we would be right out there.

**19**  Q.    Okay.

03:30  **20**  A.    And also, if I may add, that was September 12th.  She

**21**  said -- I remember her definitely saying that day, that the

**22**  weekend she was going to Imad's house.

**23**  Q.    Who was Imad again?

**24**  A.    Imad was the children's father she made a statement to us

03:31  **25**  saying that --

CONYERS - DIRECT - MACURDY

1    MR. LISBOA:  Again, Judge, hearsay.

2    THE COURT:  I don't know.

3    MR. MACURDY:  It goes the next steps of his

4 investigation, your Honor.

03:31    5    THE COURT:  Explains why he did what he did next?

6    MR. MACURDY:  Correct.

7    THE COURT:  Then the objection is overruled.

8 A.  So we knew.  So Wednesday is the 12th, she said that she

9 was going to Imad's house on the 14th, which would be the

03:31    10 Friday.  So Friday to Sunday.  And then she just made a

11 statement to me that, you know, that kind of stuck with me.

12 She said that she likes going to Imad's house because it's

13 like freedom over there.  And then she would be back to Alia's

14 house on Sunday.

03:31    15 Q.  Okay.

16 A.  So what we did at that point was, you know, we tried to

17 set something up.  We said to Mary that, listen, we're going

18 to come back and see you again but we're going to try for a

19 Monday, if possible.

03:31    20 Q.  Okay.  Did you, in fact, come back on the Monday?

21 A.  We did not.

22 Q.  And why is that?

23 A.  Sunday night Mary actually texted me and told me not to

24 come because Alia is home.

03:32    25 Q.  Okay.

1  A.   So I told her okay.

2  Q.   Okay.  So that was on Sunday the 16th?

3  A.   That text came to us on Sunday the 16th, yes.

4  Q.   So what -- what was the plan after that, then?

03:32  5  A.   The plan after that, I was already -- everything was

6  already in the works as of September 12th.  We met with our

7  victim assistant specialist in my office on September 12th to

8  start talk about trying to get Mary out of the house and

9  trying to set up a place where she could go.  So if the

03:32  10  motion -- everything was in motion as of September 12th.

11  Q.   Okay.  Let me take a step back.  So why -- based on your

12  investigation, your interviews with Mary and the source and

13  your surveillance why did you think it was necessary to take

14  Mary from the house?

03:32  15  A.   Based on the source interview and on Mary's interview, we

16  just determined that it was something that needed to be done.

17  We basically felt that she was a victim of some type of forced

18  labor.

19       MR. LISBOA:  Objection, Judge, objection.  This is

03:33  20  really -- it's to the point of usurping the jury's function.

21  He's not an opinion witness, Judge.  I'd ask that it be

22  stricken and an instruction be given.

23       THE COURT:  Any witness can give an opinion if

24  there's a rational basis for it.  He's explaining why the

03:33  25  government investigators did what they did when they did it,

CONYERS - DIRECT - MACURDY

1   which has been an issue in this case.  So continue, please.

2          MR. MACURDY:  Thank you, your Honor.

3   BY MR. MACURDY:

4   Q.   So Agent Conyers, you spoke to the victim assistance and

03:33   5   what was the new date on which you would go back to the house?

6   A.   Well, like I said, we were going to go back and just try

7   to sit down and talk to Mary again on Monday the 17th, but she

8   said not to come.  In talks with my office, we already made a

9   determination that on Tuesday the 18th we were going to take

03:33   10  Mary out of the house.

11  Q.   So just to clarify, Mary said not to come because why?

12  A.   Because Alia was home.

13  Q.   Meaning?

14  A.   Don't show up on the house on Monday because Alia is

03:34   15  there.

16  Q.   Okay.  So then what was the next date that was

17  considered?

18  A.   So the next date was considered, we actually started the

19  process of trying to obtain search warrants for the location.

03:34   20  I conducted further record checks to just make sure that Mary

21  was actually in the United States illegally -- illegally.

22  Q.   Okay.  And did you view Mary's passport?

23  A.   I did.

24  Q.   And what did you view from her passport?

03:34   25  A.   The passport had I-94 stamped April 2009 to July 2009 and

CONYERS - DIRECT - MACURDY

1    it was the classification of B1 which is a visitor for

2    business.

3    Q.   Okay.

4    A.   And based on that I-94, it appeared that Mary was in the

03:34    5    United States illegally since July of 2009.

6    Q.   What checks did you do to confirm that?

7    A.   I contacted the law enforcement service in Vermont for

8    them to conduct record checks, because I just wanted to see

9    since there was a marriage certificate in the house, was there

03:35    10   any other applications filed on Mary's behalf.

11   Q.   Were there any?

12   A.   The answer was no, the only thing that was in the system

13   was showing the April 2009 to July 1st, 2009 entry into the

14   United States from Jordan.

03:35    15   Q.   So that confirmed that she was, in fact, in illegal

16   status --

17   A.   Yes.

18   Q.   -- in the U.S.

19        Why was getting a search warrant for the house

03:35    20   important?

21   A.   Well, the search warrant is important because we're

22   looking for the elements of a crime.  So you're looking at,

23   you know, No. 1 --

24        MR. LISBOA:  Again, objection as to relevancy, Judge.

03:35    25        THE COURT:  There's been an issue as to the search of

CONYERS - DIRECT - MACURDY

1    the house and what was found.

2         MR. LISBOA:  Respectfully, Judge, he's explaining now

3    the law of search warrants and that's not relevant.

4         THE COURT:  No, he's explaining what they were trying

5    to get.  Anyway, it's time to take a break.  It's after 12:30.

6    We will take 15 minutes.

7         Ladies and gentlemen, please don't discuss the case or

8    do any research.

9         THE DEPUTY CLERK:  All rise.

10        (JURY EXITS; 12:35 p.m.)

11        THE COURT:  You can step down.

12        I assume that he, being an agent and being involved in

13   search warrants, he has some knowledge of what he needs in

14   order to get a search warrant.

15        I don't think we're going to get into a recitation of

16   the law of search warrants, but be that as it may, can we talk

17   about this request to charge from the defendants?  Cooperating

18   witness charge.

19        Clearly, she has testified -- "she," being the victim,

20   the alleged victim, Mary, has testified that she has been

21   promised certain immigration benefits in exchange for her

22   cooperation.  She did not promise that she was -- she did not

23   testify that she was promised that she would not be prosecuted

24   for the marriage.

25        So what's the government's position on her receiving

1    immigration benefits in exchange for cooperation in this case?

2         MS. OSWALD:  I think it's -- I don't think the

3    cooperation instruction is applicable on the facts in evidence

4    in this case so far, your Honor.

03:37    5         The evidence shows that she has not received a promise

6    from the government so far in the case and I think that we'll

7    hear further evidence from Special Agent Conyers.  But so far

8    the victim has testified that she hasn't cooperated.

9         This isn't your traditional situation where there's a

03:37    10    written agreement between, you know, a former drug dealer and

11    somebody who is cooperating with law enforcement in exchange

12    for benefits.

13         Mary has testified that she doesn't know what the

14    benefits are and there's been no evidence that she -- there

03:38    15    was any agreement that she must testify against the defendant

16    in order to keep her status.  In fact, it is not up to Special

17    Agent Conyers if she has continued presence or if she gets any

18    visa in particular.  The government understands that this is

19    done by the special agent in charge in Washington DC.  It's

03:38    20    not in our control, it's not in Special Agent Conyers'

21    control.

22         We can represent to the Court that no T-Visa or U-Visa

23    application has been filed.  The victim has testified that she

24    doesn't know what a T-Visa is and we have not -- we cannot,

03:38    25    the United States Attorney's office and have not promised to

CONYERS - DIRECT - MACURDY

1    grant Mary any visa in exchange for her testimony.

2         THE COURT:  Well, she testified that she's been

3    promised by the government that she could stay for two more

4    years and whatever paperwork that let's her stay in the United

5    States for two more years can be used to make an application

6    to stay further even permanently.  That's what she said.

7         MR. LISBOA:  Judge, I have the paperwork, it's

8    already marked and uploaded to the server.

9         THE COURT:  I don't doubt there's paperwork,

10   otherwise she wouldn't be here.

11        MS. OSWALD:  But the issue is, I have paperwork

12   signed by Agent Conyers requesting that she be granted such a

13   visa because she needed to cooperate with --

14        THE COURT:  Counsel, I'm with you on this one, okay?

15   I agree with you, she's been --

16        MR. LISBOA:  Thank you.

17        THE COURT:  -- made promises for immigration benefits

18   in exchange for her cooperation here.

19        MS. OSWALD:  Judge, we've done some research on this

20   and we -- such instructions are not commonly used in forced

21   labor cases.  No such instruction at all appeared Zhonj,

22   Nnaji, Marra, Toure and I can get the names for the court and

23   the court reporter.  There was an instruction on benefits in

24   Calimlim, but it was much more circumscribed than the one that

25   the defense is suggesting is appropriate for the court.

03:39
03:39
03:39
03:39
03:39
03:40

CONYERS - DIRECT - MACURDY

1          It is an instruction that we're happy to share with the

2   Court.

3          THE COURT:  I'd like to see that, please.  Doesn't

4   have to be this second.

03:40    5          MS. OSWALD:  I have it, your Honor.

6          THE COURT:  Okay.

7          MS. OSWALD:  It has a note on the top but it says

8   that you have heard the testimony from witnesses in this case

9   who received some are or all of the following benefits from

03:40   10   the government in connection with this case; namely, financial

11   or housing, and we would fill in what's applicable here.

12          You may give his or her testimony such weight as you

13   feel it deserves, keeping in mind that it must be considered

14   with caution and great care.  Something along those lines, I

03:40   15   think, and maybe we could have some time to draft it up.

16          THE COURT:  That's what I was going to tell the jury,

17   that she's been promised immigration benefits in exchange for

18   cooperation, and you should take that into account when

19   determining her credibility.

03:41   20          MS. OSWALD:  I just -- I understand that the Court is

21   inclined to give an instruction of some sort.  My hesitation

22   comes from the word "cooperation."  It just doesn't feel right

23   in this case.

24          She is -- it may be that she understands that she is

03:41   25   permitted to stay here during the course of the investigation,

CONYERS - DIRECT - MACURDY

1    but she's not cooperating with the government for the purpose

2    of prosecuting Alia al Hunaity.  That's not what's happening.

3    The word, "cooperation," suggests otherwise.

4              THE COURT:  Well, that's your version.  Defendants

03:41    5    opened saying, I think suggesting to the jury that the only

6    reason she's doing this is for immigration benefits, she's

7    making this up.

8          Now, sure, he's going to have to straighten this out,

9    but I think he's entitled or she, the defendant, is entitled

03:41   10    for me to point out to the jury that she has gotten certain --

11    promised certain immigration benefits in this case and that,

12    therefore, they should consider her testimony with caution and

13    care, period.

14              Anything else you want to talk about at this time.

03:42   15              MR. LISBOA:  No, Judge.

16              THE COURT:  Thank you.  See you in ten minutes,

17    please.

18              (RECESS TAKEN; 12:41 p.m.)

19              (The following took place in open court)

03:59   20              THE COURT:  Mr. Macurdy, are you ready?

21              MR. MACURDY:  Yes, your Honor.

22              THE COURT:  You want to grab him, please?

23                    (Brief pause)

24              THE COURT:  Ready?  Let's get the jury out, please.

04:00   25                    (Brief pause)

CONYERS - DIRECT - MACURDY

1      THE DEPUTY COURT CLERK:  All rise.

2      (Jury enters the courtroom at 1:00 p.m.)

3      THE COURT:  All right.  Okay, have a seat, and thank

4  you.

04:01      5      We'll continue.  Go ahead.

6      MR. MACURDY:  Thank you, your Honor.

7  BY MR. MACURDY:

8  Q.   Agent Conyers, I believe we were last discussing the

9  search warrant.  I'm not asking about the process for getting

04:01   10  a search warrant, but why is it important to have one for the

11  investigation?

12  A.   It's important to have one because we're looking for, you

13  know, elements of certain things.  And when we go into the

14  house, we would like to, you know, look for all the things

04:01   15  that we can actually seize from the location.

16  Q.   Did you obtain a search warrant?

17  A.   We did.

18  Q.   Did you apply for any other legal process at that time?

19  A.   We also applied for a criminal complaint for alien

04:01   20  harboring.

21  Q.   Against who?

22  A.   Against Alia Al Hunaity.

23  Q.   Okay.  And on what date was the search warrant executed?

24  A.   The search warrant was executed on September 18th,

04:01   25  Tuesday morning.

CONYERS - DIRECT - MACURDY

1    Q.   And was Alia Al Hunaity arrested on that day as well?

2    A.   She was.

3    Q.   What was the operational plan going into September 18th?

4    A.   We had eight agents assigned to the case, where it was

04:02    5    going to be two agents assigned to arrest Alia, two agents to

6    deal with the victim, Mary, and four agents to deal with the

7    search.

8    Q.   And how many days does it take to plan that sort of

9    search and arrest?

04:02    10   A.   Everything was in motion, I would say, since around the

11   Thursday, Friday prior to the takedown.

12   Q.   Now, are children inside the home a consideration in your

13   operational plan?

14   A.   Yes.

04:02    15   Q.   And were there going to be children inside the home in

16   this case?

17   A.   Yes, we knew that there were going to be three children

18   inside the location.

19   Q.   And have you dealt with the situation previously in other

04:02    20   cases where there were children inside the home during

21   execution of a search warrant?

22   A.   Yes.

23   Q.   Now, did you plan specifically to accommodate the fact

24   that there were children in the house?

04:03    25   A.   Yes, we did.

───── CONYERS - DIRECT - MACURDY ─────

1    Q.   And what was the plan?

2    A.   The plan was we had an arrest warrant in hand, we knew

3    that there were three children in the house.  So we decided

4    operationally not to -- you know, usually we would knock on

04:03    5    the door at 6 o'clock in the morning.  So in this situation we

6    decided that we were just going to do surveillance on Alia's

7    vehicle and wait for her to come to the vehicle.  So that way

8    we would not have to enter the house with the children being

9    there and the children see her, see their mother get arrested.

04:03   10    Q.   Now, did Mary know that you were coming on that day?

11    A.   She did not.

12          MR. MACURDY:  And, Miss Reed, could you pull up 302.4

13    in evidence?

14    BY MR. MACURDY:

04:03   15    Q.   And that's 522 Teel, correct?

16    A.   That's correct.

17    Q.   Now, where would the defendant be arrested in relation to

18    that photograph?

19    A.   It would be, if you see the stairs, it would be to the

04:04   20    left of the stairs, that's where her vehicle was parked.

21    Q.   Okay.  Underneath the building?

22    A.   Yes.

23    Q.   And at what time of day was she arrested, approximately?

24    A.   6:30 a.m.

04:04   25    Q.   Underneath those stairs, from her apartment, 522 Teel, is

CONYERS - DIRECT - MACURDY

1    it possible to see the area where she was arrested?

2    A.    Not where we were parked.  We were actually parked

3    underneath, so her car was the first car in and we parked

4    directly behind her vehicle.

04:04    5    Q.    Okay.  So from her apartment could anyone inside the

6    apartment seeing her being arrested?

7    A.    No.

8    Q.    Were her kids in fact anywhere in sight at that time?

9    A.    Not at all.

04:04    10    Q.    Where were the kids at the time of the defendant's

11    arrest?

12    A.    The kids were inside the house.

13    Q.    And what was your role at that time, Agent Conyers?

14    A.    My role was I was going to actually arrest Alia.  I was

04:05    15    the case agent, so I assigned two other agents to deal with

16    the victim, Mary.  And they were instructed to, you know, once

17    we arrest Alia and take her off scene that they were going to

18    knock on the door and try to get Mary to get the kids out of

19    the house.

04:05    20    Q.    Okay.  And, in fact, what did happen with the kids?

21    A.    From what I was -- this is hearsay because I was not

22    there for --

23    Q.    Okay.

24    A.    I was not there for the kids being removed out of the

04:05    25    house.

CONYERS - DIRECT - MACURDY

1   Q.   Agent Conyers, what is Mary's status, immigration status

2   in the United States?

3   A.   Currently she has continued presence.

4   Q.   What is continued presence?

04:05   5   A.   It's a temporary immigration status for individuals who

6   remain in the United States while helping out on an

7   investigation.

8   Q.   Now, who puts in the application for an individual's

9   continued status?

04:06   10   A.   His.

11   Q.   And you mentioned it's temporary.

12   A.   Yes, I did.

13   Q.   What happens if it's not renewed, what happens to the

14   individual?

04:06   15   A.   If it's not removed, the individual could be subject to

16   deportation.

17   Q.   Now, who is eligible to get continued presence status?

18   A.   It's anyone that's going to -- it could be victims, it

19   could be anyone that's going to be victims, it could be anyone

04:06   20   that can actually help in a criminal investigation while the

21   case is ongoing.

22   Q.   Well, if you're investigating a human trafficking crime,

23   and a victim involved in it is here illegally, if they're

24   taken out of the country, what happens to your investigation?

04:06   25   A.   Well, if they're taken out of the country, it can

CONYERS - DIRECT - MACURDY

1  actually harm an investigation because we won't be able to

2  interview the individual if they're deported out of the United

3  States.

4  Q.  But what is the purpose of continued presence status?

04:06    5  A.  To have individuals stay, remain in the United States on

6  a temporary basis.

7  Q.  And what is an employment authorization card?

8  A.  An employment authorization card is given to people with

9  continued presence that would allow the person to actually

04:07   10  stay in the United States and vote legally.

11  Q.  And how long does that last for?

12  A.  Two years.

13  Q.  In conjunction with the continued presence?

14  A.  For the most part, yes.

04:07   15  Q.  So, in this case who applied for Mary's continued

16  presence?

17  A.  His did.

18  Q.  Okay.  Now as the case agent in this case, did you make

19  the decision about whether Mary's continued presence was

04:07   20  granted?

21  A.  I did.

22  Q.  Did you make the ultimate decision?

23  A.  I did not make the ultimate decision.

24  Q.  So what was your role in Mary's continued presence

04:07   25  application?

CONYERS - DIRECT - MACURDY

1   A.   Well, we got the victim assistance specialist involved,

2   the paperwork was drawn up, it goes up the chain to the

3   Special Agent in Charge of the Newark District, and from there

4   it goes to headquarters in D.C.

04:08   5   Q.   Special Agent in Charge, is that the head of his in your

6   Newark Division?

7   A.   Yes.

8   Q.   And when you say it goes up the chain, who's making the

9   decision about whether to grant the continued presence?

04:08   10   A.   So like I said, it goes up the chain, so it's going to go

11   through the victim assistance specialist, it goes to

12   supervisors up to the SAC, it goes through the SAC and then

13   from there to the headquarters in D.C.

14   Q.   And just for the jury, the SAC, is that the Special Agent

04:08   15   in charge?

16   A.   Yes.

17   Q.   And do each of those people have to approve the

18   application?

19   A.   They sign off on it, yes.

04:08   20   Q.   So have you ever at any time promised Mary that she could

21   stay permanently in this country?

22   A.   Never.

23   Q.   Have you ever promised Mary any benefits?

24   A.   No.

04:09   25   Q.   Have you ever talked to her about getting a visa?

CONYERS - DIRECT - MACURDY

1  A.  Never talked to her about getting a visa.

2  Q.  Have you ever promised her that she could stay in this

3  country if she helped with the investigation?

4  A.  No.

04:09    5  Q.  Was Mary referred to any non-governmental organizations?

6  A.  She was, yes.

7  Q.  And what do those organizations offer?

8  A.  They offer housing and benefits, because once you take a

9  victim out of a house, they need a place to stay, and they

04:09    10  need food.

11  Q.  Are there any special visas available to victims of human

12  trafficking crimes?

13  A.  Yes.

14  Q.  And, Agent Conyers, what is a T visa?

04:09    15  A.  A T visa's a visa for human trafficking victims.

16  Q.  And does it allow those victims, if they obtain it, to

17  remain in the country legally?

18  A.  If they obtain it, yes.

19  Q.  Has Mary applied for a T visa?

04:09    20  A.  I don't know.

21  Q.  If Mary put in for a T visa, who would make the

22  determination whether it was granted?

23  A.  That determination would go, Citizenship Immigration

24  Services, CIS would make the ultimate decision if that was

04:10    25  granted.

CONYERS - DIRECT - MACURDY

1   Q.   Would you have any input on that determination?

2   A.   No.

3   Q.   Agent Conyers, I want to turn back to the date of the

4   defendant's arrest, September 18, 2018.  Was she searched

04:10   5   after her arrest?

6   A.   Yes, she was actually searched at her vehicle.

7   Q.   And did she have a cellular phone in her possession?

8   A.   She did.

9   Q.   I'm going to show you Exhibit 202 for identification.  Do

04:10   10   you recognize Exhibit 202, Agent Conyers?

11   A.   I do.

12   Q.   And what is it?

13   A.   It's a red cellular phone, iPhone.

14   Q.   Where was it recovered?

04:11   15   A.   It was recovered from Alia Al Hunaity, it was on her

16   possession.

17   Q.   Thank you, Agent Conyers.

18        MR. MACURDY:  I'm not moving this into evidence, your

19   Honor.

04:11   20        THE COURT:  You are not?

21        MR. MACURDY:  I am not.

22        THE COURT:  Thank you.

23   BY MR. MACURDY:

24   Q.   Was the defendant interviewed on the date of her arrest,

04:11   25   Agent Conyers?

CONYERS - DIRECT - MACURDY

1  A.  Yes.  Okay, so once we arrested her, we transported her

2  back to our his office in Newark, New Jersey.  We read her a

3  statement of her rights, and she waived her rights and opted

4  to talk to agents.

04:11    5  Q.  And who was present for that interview?

6  A.  Agent Jennifer Miller.

7  Q.  Were you present as well?

8  A.  Yes.

9  Q.  About how long was her interview with law enforcement?

04:11   10  A.  Approximately 19 minutes.

11        MR. MACURDY:  Miss Reed, if you could bring up on the

12  screen for Agent Conyers.

13  BY MR. MACURDY:

14  Q.  Was it video recorded?

04:11   15  A.  It was video and audio recorded, yes.

16        MR. MACURDY:  Miss Reed, could you bring up

17  Exhibit 401 for Agent Conyers?

18  BY MR. MACURDY:

19  Q.  Agent Conyers, was a transcript also prepared of that

04:12   20  statement?

21  A.  Yes, it was.

22        MR. MACURDY:  Miss Reed, if you could -- your Honor,

23  if there's no objections, I'd like to move it into evidence.

24        MR. LISBOA:  None, Judge.

04:12   25        THE COURT:  Well, what exactly is 401?  Is it the

CONYERS - CROSS - LISBOA

1  video, audio, and transcript?  Is it all together?

2          MR. MACURDY:  It's the video and the transcript, your

3  Honor.

4          THE COURT:  Okay.  It's received in evidence.

04:12  5  (GOVERNMENT EXHIBIT 401 WAS RECEIVED IN EVIDENCE)

6          THE COURT:  You want to display it now?

7          MR. MACURDY:  Yes, your Honor.

8          THE COURT:  Go ahead.

9          MR. MACURDY:  Miss Reed, if you could play

04:12  10  Exhibit 401?

11                  (The video was then played)

12          MR. LISBOA:  Judge, there's no audio.

13                  (The video was then played)

14                  (The video was then stopped)

04:30  15          MR. MACURDY:  No further questions, your Honor.

16          THE COURT:  Cross examine.

17  (CROSS EXAMINATION OF AGENT CONYERS BY MR. LISBOA:)

18  Q.  Good afternoon, Agent.

19  A.  Good afternoon.

04:30  20  Q.  How are you?

21  A.  Fine.

22  Q.  Agent, calling your attention to September the 11th of

23  2018, that would have been the first day that you actually

24  spoke to Ms. Vithanalage; is that right?

04:31  25  A.  That's correct.

*United States District Court*
*Camden, New Jersey*

CONYERS - CROSS - LISBOA

1    Q.   Who you later came to know as Mary?

2    A.   Yes.

3    Q.   And prior to that date, my understanding is that you had

4    received information from an informant; is that right?

04:31   5    A.   It was a source of information.

6    Q.   Source?

7    A.   Yes.

8    Q.   Okay.  Source meaning a person who provides you

9    information; is that right?

04:31   10   A.   Correct.

11   Q.   Which you can use to conduct an investigation; is that

12   right?

13   A.   Correct.

14   Q.   And one of the things, and one of the reasons why you

04:31   15   confirm the tip is to see if you can verify; is that right?

16   A.   That's correct.

17   Q.   Because sometimes people may give you wrong information;

18   is that right?

19   A.   That's correct, yes.

04:31   20   Q.   And you wouldn't want to arrest someone based upon wrong

21   information; is that right?

22   A.   Correct.

23   Q.   So, and at a certain point based off of that information,

24   you start conducting surveillance of Teel Plaza; is that

04:32   25   right?

CONYERS - CROSS - LISBOA

1    A.    Yes.

2    Q.    Okay.  And is this on foot, is this in a car?  Both?

3    Something else?

4    A.    It's both.

04:32    5    Q.    Okay.  And did this involve trying to see if you could

6    identify people?

7    A.    Yes.

8    Q.    Okay.  See if you could interview people?

9    A.    No.  Just surveillance on foot and in the vehicle.

04:32    10    Wasn't trying to interview anyone at the location.

11    Q.    And the original source of information had led you to

12    believe and establish a target; is that right?

13    A.    That's correct.

14    Q.    What is a target in terms of police terminology?

04:32    15    A.    The target is going to be a person of interest that you

16    may be looking into.

17    Q.    Okay.  And the person, the target of interest in

18    September was Mohammad Al Hunaity; is that right?

19    A.    That's correct.

04:32    20    Q.    Okay.  And so everyone understands, that is actually

21    Alia's brother; is that right?

22    A.    Yes.

23    Q.    Okay.  And by the way, with regard to Alia's brother,

24    safe to say that he is not a United States citizen, to your

04:33    25    knowledge?

CONYERS - CROSS - LISBOA

1  A.   To my knowledge he is a lawful permanent.

2  Q.   Okay.  But not a citizen.

3  A.   Not a citizen.

4  Q.   So, at a certain point you start conducting surveillance;

04:33  5  is that right?

6  A.   That's correct.

7  Q.   Did you obtain pictures of Mohammad?

8  A.   I did not.

9  Q.   But at a certain point the decision, the decision is made

04:33  10  on September the 11th, 2018; is that right?

11  A.   Yes.

12  Q.   To try to make contact with this Mary individual; is that

13  right?

14  A.   That's correct.

04:33  15  Q.   Okay.  And did you knock on the door?

16  A.   Yes.

17  Q.   Okay.  And how did you introduce yourself?

18  A.   As a Special Agent from Homeland Security.

19  Q.   And did you have a uniform on, did you have a nice suit

04:33  20  like you have on today.  How were you dressed?

21  A.   No, just regular street clothes.

22  Q.   Street clothes.  Was it like jeans and a sweatshirt type

23  of thing?

24  A.   Jacket with a -- for the most part I wear jeans and a

04:33  25  golf shirt.

CONYERS - CROSS - LISBOA

1   Q.   Okay.  And you said you had another agent with you; is
2   that right?
3   A.   That's correct.
4   Q.   And who was that?
04:34   5   A.   Shirley Vasquez.
6   Q.   Is that the person who's depicted in the video?
7   A.   No.
8   Q.   Who's depicted in the video, just so we know?
9   A.   Agent Jennifer Miller.
04:34   10  Q.   Okay.  Agent Miller was with you, though, during the
11  raid; is that right?
12  A.   During the arrest, yes.
13  Q.   Okay.  So, different agent with you, female agent?
14  A.   Yes.
04:34   15  Q.   Okay.  And the purpose behind that, you said, is that to
16  generate some sort of a rapport?
17  A.   That's correct.
18  Q.   Some people may like to talk to women; is that right?
19  A.   That's correct.
04:34   20  Q.   Others may like to talk to men?
21  A.   Yes.
22  Q.   Okay.  So, you knock on the door; is that right?
23  A.   Correct.
24  Q.   How was Mary dressed?
04:34   25  A.   Mary had pajamas on, I would that, yes.  Definitely a

*United States District Court*
*Camden, New Jersey*

CONYERS - CROSS - LISBOA

1    pajama top, one of these tank tops.

2    Q.    Okay.  Was the TV on?

3    A.    Don't recall.

4    Q.    Okay.  Did she have a mop in her hand?

04:34    5    A.    No.

6    Q.    Any type of cleaning utensils in her hand?

7    A.    Not to my knowledge, no.

8    Q.    Did the dishwasher sound like it was running?

9    A.    Can't recall that.

04:34    10    Q.    Okay.  Did she sign any type of paperwork, permission to

11    allow to you enter to take a look around the house?

12    A.    She did not.

13    Q.    Okay.  Did you take any photographs of the location at

14    that point when you entered the house?

04:35    15    A.    I took photographs of the kitchen area.

16    Q.    Okay.  And one of the things that law enforcement will do

17    when they introduce themselves, okay, is to ask for

18    identification; is that right?

19    A.    That's right.

04:35    20    Q.    Did you ask for identification?

21    A.    We did.

22    Q.    What type of identification did you ask for?

23    A.    We asked for any type of identification so that we could

24    verify who she was.

04:35    25    Q.    Was she able to do that?

CONYERS - CROSS - LISBOA

1    A.    She was.

2    Q.    Okay.  What did she produce?

3    A.    She produced a Sri Lankan passport.

4    Q.    Okay.  And she was able to produce that straight to you;

04:35    5    is that right?

6    A.    Yes, she went upstairs and got the document for us.

7    Q.    Okay.  And it wasn't like she had it in her pajama pants

8    pocket, right?

9    A.    No.

04:35    10    Q.    So she gave you this passport; is that right?

11    A.    Yes.

12    Q.    What did you do with the passport?

13    A.    Took pictures of the passport.

14    Q.    Okay.  With a cell phone?

04:35    15    A.    Yes.

16    Q.    Okay.  And the purpose for that was to do an

17    investigation; is that right?

18    A.    Yes.

19    Q.    To check ICE's records, when say ICE, Immigration Customs

04:36    20    and Enforcement, now umbrellaed over Homeland Security; is

21    that right?

22    A.    Yes.

23    Q.    Because you, your organization keeps records of people

24    that come into the country; is that right?

04:36    25    A.    That's correct.

CONYERS - CROSS - LISBOA

1  Q.  Okay.  And your job is to enforce immigration laws; is

2  that right?

3  A.  Yes.

4  Q.  Okay.  So you took that information to look up in the

04:36  5  future; is that right?

6  A.  I took the information to look up the status of the

7  individual.

8  Q.  Was there anything you noted about the passport when you

9  first looked at it?

04:36  10  A.  I saw the I-94 from the time of arrival.

11  Q.  Okay.  Did you see any visas in the passport?

12  A.  I saw a visa in the passport.

13  Q.  Did you see that it was expired?

14  A.  If you're asking me did I see if the visa was expired, I

04:36  15  can't remember that right now.

16  Q.  Okay.  But that would be one thing that you would look

17  for; is that right, looking at her passport?

18  A.  Passport, yes.

19  Q.  Okay.  And have you worked at the airport or any border

04:36  20  crossing?

21  A.  Yes, I was an Immigration Inspector.

22  Q.  Okay.  So meaning that if I get off the plane, right, I

23  can present with my passport; is that right?

24  A.  That's correct.

04:37  25  Q.  And you would look at it?

CONYERS - CROSS - LISBOA

1    A.   Yes.

2    Q.   Nowadays I think they scan it?

3    A.   I don't know what they do nowadays --

4    Q.   With the --

04:37    5    A.   -- it's been a while.

6         THE COURT:  Wait, wait, one at a time.  Let him

7    finish please.

8         MR. LISBOA:  Sorry.

9         THE COURT:  Continue.  One at a time, please.

04:37    10        THE WITNESS:  I don't know what they do nowadays,

11   it's been a long time since I've worked at the airport.

12   BY MR. LISBOA:

13   Q.   But the general, your general understanding is people

14   have passports right?

04:37    15   A.   Yes.

16   Q.   That have stamps in them?

17   A.   Correct.

18   Q.   So, at that time you didn't realize whether or not

19   anything might have been off, expired, with regard to that

04:37    20   passport?

21   A.   Regarding the passport, I knew that the I-94 was expired,

22   yes.

23   Q.   Okay.  So you noted that?

24   A.   Yes.

04:37    25   Q.   Okay.  With regard to the passport, was that passport

CONYERS - CROSS - LISBOA

1    expired or was it still valid?

2    A.   The passport was still valid.

3    Q.   Okay.  Now, did you give it back to her?

4    A.   I did.

04:37    5    Q.   Okay.  Did you place her under arrest?

6    A.   We did not.

7    Q.   You told her you were a police officer; is that right, or

8    a law enforcement officer?

9    A.   Told her we were law enforcement officers, yes.

04:37   10    Q.   Okay.  Were you armed that day?

11    A.   I was.

12    Q.   How about Agent, was it Vasquez?

13    A.   Yes.

14    Q.   She was also armed?

04:38   15    A.   I'm pretty sure she was.

16    Q.   Okay.  Because you don't like to go out on

17    investigations, you don't know who you're going to meet; is

18    that right?

19    A.   Exactly.

04:38   20    Q.   So you carry a firearm; is that right?

21    A.   Yes.

22    Q.   Okay.  And a badge?

23    A.   And a badge.

24    Q.   Identification?

04:38   25    A.   Identification.

CONYERS - CROSS - LISBOA

1    Q.    Business card?

2    A.    Yes.

3    Q.    So again, from the start you were able to determine that

4    she was able to give you her passport; is that right?

04:38    5    A.    That's correct.

6    Q.    Okay.  Now, is it safe to say that that conflicted with

7    the information that you had been provided by the informant?

8    A.    No.

9    Q.    Okay.  Would you agree that the informant told you that

04:38    10    her -- well, that Mohammad was holding on to her documents?

11    A.    That was the -- that's in the original complaint, yes.

12    Q.    Exactly.  But when you knock on the door (indicating),

13    the person introduces themselves who you later learn to be is

14    Mary, is that right?

04:38    15    A.    Correct.

16    Q.    She produces you her passport, is that right?

17    A.    That's correct.

18    Q.    Okay.  Now, when you're interviewing her, okay, and

19    again, your specialty is human trafficking?

04:39    20    A.    That's correct.

21    Q.    Various types, is that right?

22    A.    Yes.

23    Q.    Okay.  So I don't want to assume, but given your training

24    and experience, there would be certain things that you're

04:39    25    looking for, is that right?

CONYERS - CROSS - LISBOA

1    A.    That's correct.

2    Q.    Okay.  Again, either to advance your theory that maybe

3    some sort of crime is happening, is that right?

4    A.    Yes.

04:39    5    Q.    And also, to look for evidence which may suggest that, in

6    fact, nothing is really wrong, is that right?

7    A.    That's correct.

8    Q.    Because you're trying to be fair, is that right?

9    A.    Yes.

04:39    10    Q.    And one of the things that you do to help you is, you

11    take notes, is that right?

12    A.    That's correct.

13    Q.    Okay.  And during that initial interview, you took notes,

14    is that right?

04:39    15    A.    Yes.

16    Q.    Okay.  And two pages?

17    A.    I don't recall how many pages.

18    Q.    On that particular date?

19    A.    Yes.

04:39    20    Q.    If I showed you the notes, would that refresh your

21    recollection?

22    A.    Yes.

23    Q.    Agent Conyers, do you see D-132?

24    A.    Yes.

04:41    25    Q.    Okay.  Is that the first page of your notes?

CONYERS - CROSS - LISBOA

1    A.    Yes.

2    Q.    And that date has -- it says 9-11-18 on there, is that

3    right?

4    A.    That's correct.

04:41    5    Q.    Do you recognize your handwriting?

6    A.    I do.

7    Q.    Okay.  Show you the next page.

8    A.    Yes.

9    Q.    Okay.  Is that the second page of the notes?

04:41    10   A.    Yes.

11   Q.    Now, you agree that the purpose of these notes is to have

12   an immediate record of anything that you may note, is that

13   right?

14   A.    That's correct.

04:41    15   Q.    Or any information that a particular witness, right, and

16   especially someone who you think may be a victim would give

17   you, is that right?

18   A.    That's correct.

19   Q.    Now, the first thing we have on your notes is the

04:41    20   person's name, is that correct?

21   A.    Yes.

22   Q.    Okay.  You wrote up their passport?

23   A.    Yes.

24   Q.    Okay.  And then you have there -- there must have been a

04:42    25   discussion about Christian converted to Muslim, is that right?

CONYERS - CROSS - LISBOA

1   A.   Correct.

2   Q.   Then you have work for mother and father of Alia in

3   Jordan for nine years, is that right?

4   A.   Yes.

04:42   5   Q.   And then you have gave money for new passport.

6   A.   Before that, this -- then came to United States to work

7   for Alia.

8   Q.   Right.  Okay.

9   A.   Yes.

04:42   10   Q.   Gave money for new passport upstairs?

11   A.   Yes.

12   Q.   150 approximately?

13   A.   Yes.

14   Q.   In drawer, in boys room.

04:42   15   A.   That's correct.

16   Q.   Okay.  Did she tell you that she actually had $160 that

17   was left over from a $2,000 payment?

18   A.   She did not.

19   Q.   Okay.  And then what's the next thing she told you?

04:42   20   A.   I'm happy, I've been here 18 years with them.

21   Q.   So she said she was happy?

22   A.   Yes.

23   Q.   Just so I understand, your initial interview at that

24   point, okay, she doesn't tell you, I'm miserable.

04:42   25   A.   No.

CONYERS - CROSS - LISBOA

```
 1   Q.   I hate it here.

 2   A.   No.

 3   Q.   Okay.  I'm being held against my will, is that right?

 4   A.   Correct.

 5   Q.   Okay.  Let me show you the next page.

 6        You have here in U.S., April --

 7             MR. MACURDY:  I object, just reading of notes is

 8   hearsay.

 9             THE COURT:  It's not in evidence.

10             MR. LISBOA:  Well --

11             THE COURT:  Are you asking him to refresh his

12   recollection or are you moving this into evidence?

13             MR. LISBOA:  I can, Judge.  I'll move it.

14             THE COURT:  He's moving D-132 into evidence.

15             MR. MACURDY:  I object, your Honor, it's hearsay.

16             THE COURT:  Hearsay?

17             MR. LISBOA:  Present sense impression, Judge.

18             THE COURT:  Well, maybe, maybe not.  I have to read

19   the whole thing.

20        Well, he's not making comments on his impressions, he's

21   just apparently writing down things that she said.

22        Is that what you're doing here, just writing down what

23   she said?

24             THE WITNESS:  Yes.

25             THE COURT:  Is this your analysis of what she said or
```

04:43 (lines 5, 10, 15, 20, 25)

*United States District Court*
*Camden, New Jersey*

CONYERS - CROSS - LISBOA

1   just what she said?

2          THE WITNESS:  That's basically what she said, yes.

3          THE COURT:  Is that what you're supposed to do, write

4   down -- try to write down and remember word for word what

04:44   5   somebody else told you?

6          THE WITNESS:  Yes, I just take rough notes.

7          THE COURT:  Well, I'll sustain that objection.  If

8   it's being offered the truth.  If you're trying to get into

9   what these are saying, you can ask him.

04:44   10         MR. LISBOA:  It's prior recollection recorded, but

11  I'll move on, Judge.

12  BY MR. LISBOA:

13  Q.   Agent, with regard to the notes, is it fair to say that

14  at no point, okay, but in your notes, did Mary say she was

04:44   15  being enslaved, held against her will, any point that you

16  noted in your note?

17  A.   No, it was not noted in the notes.

18  Q.   Now, correct me if I'm wrong, your original source of

19  information, okay, had told you that Mary was being beaten, is

04:44   20  that right?

21  A.   That's -- I would have to read, look at the complaint

22  again just to see.

23  Q.   Okay.  Would you like me to show you your report to

24  refresh your recollection?

04:45   25  A.   Yes.

CONYERS - CROSS - LISBOA

1   Q.   Agent, I'm going to show you what I have marked as D-143

2   for identification purposes only, ask you to take a look at

3   the cover sheet and tell me if you recognize this report.

4   A.   I do, yes.

04:46   5   Q.   And turn to the second page.

6   A.   I recognize it.

7   Q.   Okay.  Now, with regard to this report, this was the

8   initial source interview report, is that right?

9   A.   That's correct.

04:46   10   Q.   Now, in this report, does it indicate that the original

11   source was alleging that Mary was being --

12          MR. MACURDY:  Objection, your Honor.  If he wants to

13   refresh the recollection, he can let the witness read it

14   rather than read it to him.

04:47   15          THE COURT:  If that's what you're trying to do, then

16   the witness can read it.

17          MR. LISBOA:  That's fine.  That's an appropriate

18   objection, Judge.  Let's let the officer read it.

19          THE COURT:  Read it to himself because it's not in

04:47   20   evidence.

21   BY MR. LISBOA:

22   Q.   Call your attention to Page 3.

23   A.   Okay.

24   Q.   It's the middle paragraph, third up from the bottom.

04:48   25   A.   You said third up from the bottom?  Sorry.

CONYERS - CROSS - LISBOA

```
 1   Q.   Yes.

 2   A.   Okay.  Yes.

 3   Q.   Do you see that?

 4   A.   Yes.

 5   Q.   And would you agree that your source of information was

 6   telling you, as a law enforcement officer, that somebody is

 7   being hit, is that right?

 8   A.   That's correct.

 9   Q.   So again, when you saw that, again, that would probably

10   be something that you, as a trained officer, especially in

11   your field, okay, would be concerned about, is that right?

12   A.   Very concerned about, yes.

13   Q.   That would be something that you would want to either

14   corroborate, is that right?

15   A.   Correct.

16   Q.   Okay.  Or figure out whether or not that was a completely

17   false accusation, is that right?

18   A.   Correct.

19   Q.   And again, comparing this source report to your interview

20   with Mary, okay, it's safe to say that when you spoke to Mary,

21   she denied ever being hit by anyone, is that right?

22   A.   Yes.

23   Q.   Okay.  Now, the prosecutor had asked you about the search

24   warrant, is that right?

25   A.   Correct.
```

Time stamps: 04:48, 04:48, 04:48, 04:49, 04:49

CONYERS - CROSS - LISBOA

1    Q.   And the search warrant was important because you're

2    looking for certain evidence of things that may, again,

3    advance your theory, is that right?

4    A.   Correct.

04:49    5    Q.   Okay.  And also that may potentially show that nothing

6    was happening at all, is that right?

7    A.   That's correct.

8    Q.   Nothing criminal was happening, is that right?

9    A.   Correct.

04:49    10   Q.   And you viewed the search warrant is relied upon -- well,

11   the search warrant is a document, is that right?

12   A.   That's correct, yes.

13   Q.   And you apply to the Court, is that right?

14   A.   Yes.

04:49    15   Q.   And you have to allege certain information in that search

16   warrant which is factually accurate, is that right?

17   A.   That's correct.

18   Q.   Okay.  And when you applied for this search warrant, it's

19   safe to say that that was on September 17th, 2018, is that

04:50    20   right?

21   A.   Yes.

22   Q.   Okay.  I'm going to show you -- Agent Conyers, I ask you

23   to take a look at D-216 which is for identification purposes

24   only, and ask you to take a look at that cover sheet and if

04:50    25   you can, tell me what that is.

CONYERS - CROSS - LISBOA

1    A.    Application for search warrant.

2    Q.    Okay.  And that was submitted, looks like it was sworn,

3    is that right?

4    A.    Yes.

04:50    5    Q.    And when it's sworn, that means that this has to be the

6    truth, is that right?

7    A.    Correct.

8    Q.    You would not want information in here that was false, is

9    that right?

04:51    10    A.    That's correct.

11    Q.    You wouldn't want information in here that was materially

12    misleading, is that right?

13    A.    Yes.

14    Q.    You wouldn't want to omit facts, is that right?

04:51    15    A.    Yes.

16    Q.    Or information?

17    A.    Correct.

18    Q.    So we have the initial source interview, is that right?

19    A.    Correct.

04:51    20    Q.    And that source interview, what date was that again, that

21    was --

22    A.    August 27th.

23    Q.    August 27th, 2018.  You do some surveillance, is that

24    right?

04:51    25    A.    Yes.

CONYERS - CROSS - LISBOA

1  Q.  Okay.  You spoke to Mary on the 11th?

2  A.  Correct.

3  Q.  You spoke to her on the 12th?

4  A.  Yes.

04:51  5  Q.  Did you speak to her on the 13th?

6  A.  No.

7  Q.  But on the 11th and the 12th, she had already told you

8  she wasn't being hit, is that right?

9  A.  Correct.

04:51  10  Q.  Okay.  Now, I call your attention to Page 5 of D-216.

11  Okay.  Ask you to take a look at Paragraph 10.

12  A.  Okay.  Yes.

13  Q.  See that paragraph?

14  A.  I do.

04:52  15  Q.  Okay.  So when you applied for this search warrant on the

16  17th, you knew from Mary, from her lips to your ears, that she

17  wasn't being hit, is that right?

18  A.  I would -- definitely would like to review the two

19  interviews that I --

04:53  20  Q.  Okay.

21  A.  -- that I interviewed Mary on the 11th and the 12th.

22  Q.  Okay.  I'll show you that.

23     Agent, I'm showing you D-100 for identification.

24  A.  Okay.

04:54  25  Q.  Cover sheet.

—— CONYERS - CROSS - LISBOA ——

1   A.   Yes.

2   Q.   Okay?  Is this the initial interview report?

3   A.   Go to the next page, please.  Yes.

4        Do you have a better copy that I can hold in hand and

04:54   5   read?

6   Q.   Let me see if we can help you.

7        MR. LISBOA:  Judge, can I approach the witness?

8        THE COURT:  Sure.

9        MR. LISBOA:  Thank you.

04:55   10   BY MR. LISBOA:

11   Q.   Agent, I'll show you a paper copy.  I like paper better

12   than digital myself.

13   A.   Okay.  Okay.

14   Q.   Show you the next one, which is marked for identification

04:56   15   only, D-101.  D-101 for identification.

16   A.   Okay.

17   Q.   You reviewed that?

18   A.   Yes.

19   Q.   Okay.  Now, Agent, you testified that when you

05:00   20   interviewed Mary on the 11th and the 12th, right?

21   A.   Yes.

22   Q.   Your assessment that she wasn't in any danger, is that

23   right?

24   A.   That's right.

05:00   25   Q.   And that was a concern to you, is that right?

*United States District Court*
*Camden, New Jersey*

CONYERS - CROSS - LISBOA

1   A.   That's correct.

2   Q.   Just in general.

3   A.   Yes.

4   Q.   Okay.  But more specifically, because you had an

05:00   5   allegation that she was being hit, is that right?

6   A.   That's correct.

7   Q.   But after you met her and spoke to her, you knew she

8   wasn't being hit, is that right?

9   A.   She didn't say either/or why she was hit or not.

05:00   10  Q.   So you didn't ask, never asked?

11  A.   We didn't ask.

12  Q.   So you're saying that you went there to do an assessment

13  of whether she was in danger and you didn't ask her if she was

14  being hit, is that right?

05:00   15  A.   That's correct.

16  Q.   Okay.  So when did you find out officially that she

17  wasn't being hit?

18  A.   This would have to have been way after the fact.

19  Q.   Way after the fact?

05:01   20  A.   Yes.

21  Q.   You agree, though, in your search warrant at Paragraph

22  10, you told the Judge that based upon your information --

23          MR. MACURDY:  Objection.

24          THE COURT:  Let's go to sidebar.

05:01   25          (SIDEBAR AS FOLLOWS:)

*United States District Court*
*Camden, New Jersey*

CONYERS - CROSS - LISBOA

1          THE COURT:  What's your objection?

2          MR. MACURDY:  Well, he's going to read that into the

3    record.  I mean that it's pretty clear in the warrant, it says

4    from the source of information said on two occasions that Mary

05:01    5    had been beaten, so it really has nothing to do with what Mary

6    said.

7          THE COURT:  I don't know what the question is, but

8    clearly, he never said in the application that Mary said she

9    was being hit.

05:01    10          MR. LISBOA:  I'm just saying we represent it to the

11    Court, it's his statement, it's his prior statement.

12          THE COURT:  His prior statement was the source, the

13    informant, that she was being hit.  Never said Mary said.

14          MR. LISBOA:  It's his prior statement under oath to

05:02    15    the Court, Judge.

16          THE COURT:  But how is it inconsistent with what he

17    said here?

18          MR. LISBOA:  Judge, it goes to his credibility, what

19    he says in prior statements.  I'm allowed to cross-examine

05:02    20    him.

21          THE COURT:  Of course it does.  To any prior

22    inconsistent statement goes to credibility, but there's

23    nothing inconsistent about what he said in the search warrant

24    application to what he's testified here to today.

05:02    25          MR. LISBOA:  Well, Judge, I disagree with that.

*United States District Court*
*Camden, New Jersey*

CONYERS - CROSS - LISBOA

1        THE COURT:  What in that paragraph is inconsistent

2   with -- let me finish, please.  What in the paragraph is

3   inconsistent with what he's testified to today?

4        MR. LISBOA:  On direct, he previously testified that

05:02   5   he made an assessment that her life and safety was not in

6   jeopardy, that she was not threatened.

7        THE COURT:  The question is --

8        MR. LISBOA:  And that's why he didn't take her out of

9   the house.  He represents the opposite to the Court.

05:02   10        THE COURT:  No, he doesn't.

11        MR. LISBOA:  Yes, he does, Judge.  I disagree.

12        THE COURT:  He said the informant said and that he

13   also repeated on your cross-examination that he didn't believe

14   she was in danger.

05:02   15        MR. LISBOA:  It's still a representation to the Court

16   that she is in danger.  It's a false representation in my

17   opinion to the Court to represent that his information that

18   she was actually being hit when, in fact, he knew she was not

19   being hit.

05:03   20        THE COURT:  Oh, I don't know how you can say he knew

21   she wasn't being hit.

22        MR. LISBOA:  He asked her.

23        THE COURT:  He said he didn't ask her.

24        MR. LISBOA:  If he does, Judge, then I think I should

05:03   25   be allowed wide latitude to cross-examine him on.  He made a

*United States District Court*
*Camden, New Jersey*

CONYERS - CROSS - LISBOA

1    prior representation to the Court that she was being hit based

2    upon information he didn't see firsthand.  He obviously got it

3    secondhand from either Mary or informants or any other source.

4         THE COURT:  It clearly says it was from the

05:03    5    informant.  The application clearly says that information

6    comes from the informant.  It never even comes from Mary.

7         MR. LISBOA:  There's nothing that this officer

8    actually saw with his own eyes, it's all information he got,

9    Judge, and respectfully, the government's been allowed to lead

05:03    10    on a lot of things which I've objected to and are hearsay.

11         THE COURT:  But it is not improper to put hearsay in

12    a search warrant application.

13         MR. LISBOA:  I understand that.  All I'm saying is

14    that he had the opportunity to verify it, okay?  He knew at

05:04    15    that point that she had not been hit and he's still making a

16    representation under oath that she is being hit.

17         THE COURT:  You're opening a door here and we're not

18    going to get into what the judge -- information the judge had

19    in granting the search warrant request.

05:04    20         MR. LISBOA:  That's not what I'm getting into.  I'm

21    getting into the fact that it's a prior inconsistent statement

22    especially when it's under oath.

23         THE COURT:  It's not an inconsistent statement, but

24    we're done for the day anyway, because it's 2 o'clock.

05:04    25         What do you want to do about the juror problem?

CONYERS - CROSS - LISBOA

1          MS. OSWALD:  Judge, we're concerned that we might run

2     out of alternates if we start again on Monday.  Is the --

3          THE COURT:  Well, what are we going to do?

4          MS. OSWALD:  You said one option is to start on

05:04  5  Wednesday?

6          THE COURT:  We can come back and -- well, we can come

7     back on Wednesday.  I don't know, I have no idea how long

8     you're going to take for the rest of this trial.

9          MS. OSWALD:  We're pretty much -- well, we have one

05:04  10 more witness after Special Agent Conyers, so I think if we --

11    our biggest concern would be losing alternates, so we would

12    prefer to start on Wednesday.

13         THE COURT:  Well, we only need 12 people to start

14    deliberations, because I can take it right from 11 under the

05:05  15 rules.

16         The one juror, we're not going to -- she will be here,

17    No. 6, she just can't be here Tuesday.

18         So what's your position on the jurors?

19         MR. LISBOA:  My experience is the longer it goes, the

05:05  20 more would we start getting into other, you know, personal

21    obligations, which people didn't normally think about that

22    they had because we told them it was going to be, you know --

23    so, you know, my inclination is to go straight through.

24         THE COURT:  So you want to dismiss the two jurors,

05:05  25 substitute the alternates, go Monday until whenever?

*United States District Court*
*Camden, New Jersey*

CONYERS - CROSS - LISBOA

1          MR. LISBOA:  Judge, can I talk to the client first

2     with Mr. Kovic?

3          THE COURT:  Sure.

4          (Mr. Kovic and Mr. Lisboa confer with defendant.)

05:07    5          MR. LISBOA:  Judge, we've discussed the matter and it

6     appears that we're in agreement for Wednesday.

7          THE COURT:  Okay.  Okay.  That's what I'll tell the

8     jurors.  Come back Wednesday and we'll work until 4:30.  9 to

9     4:30, from here on out, okay?

05:07   10          MS. OSWALD:  Thank you, your Honor.

11          (END OF SIDEBAR.)

12          THE COURT:  All right.  Mr. Blake, in Seat No. 4,

13     you are going to be excused because we are going to continue

14     this next week obviously, but thank you for coming in.  We

05:07   15     appreciate your service.

16          You're unavailable Monday and Tuesday Mr. Madison,

17     correct?

18          JUROR:  Yes.

19          THE COURT:  All right.  What we're going to do is,

05:08   20     we're going to take this up again Wednesday morning at

21     9 o'clock and we're going to work until 4:30.

22          We will supply lunch.  So the first thing you do when

23     you get here on Wednesday morning, Mr. MacStravic will take

24     your lunch.

05:08   25          Now, what that means is, since Mr. Blake is leaving

CONYERS - CROSS - LISBOA

1    Mr. Deitz, you're going to take Seat No. 4.  Mr. Deitz will

2    take Seat No. 4 on Wednesday.  Okay?

3         All right.  Have a great weekend.  It's crucial, once

4    again, that you not talk to anybody about this case or not to

05:08    5    do any research on this case.  Have a great weekend.  We will

6    see you all Wednesday morning.  Thank you.

7              THE DEPUTY CLERK:  All rise.

8              (JURY EXITS; 2:07 p.m.)

9              THE COURT:  Anything else?

05:09    10             MS. OSWALD:  No, your Honor.

11             THE COURT:  I'll see everybody Wednesday morning.

12    Thank you.

13             MS. OSWALD:  Thank you, Judge.

14             (2:08 p.m.)

15        We certify that the foregoing is a correct transcript

16    from the record of proceedings in the above-entitled matter.

17

18    */S/ Carl Nami, Official Court Reporter*

19    */S/ Karen Friedlander, Official Court Reporter*

20

*Court Reporters/Transcribers*

21

22    *May 03, 2019*

23

24

25

*United States District Court*
*Camden, New Jersey*